FILED
11/22/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 11, 2022 Session

IN RE  MASSON S.

Appeal from the Juvenile Court for Anderson County
No. 20-0183  Brian J. Hunt, Judge
_____

No. E2021-01196-COA-R3-PT
_____

The Tennessee Department of Children's Services filed a petition to terminate a mother's parental rights to her son based on abandonment by failure to provide a suitable home, abandonment by an incarcerated parent, substantial noncompliance with permanency plans, failure to remedy persistent conditions, and failure to manifest an ability and willingness to assume custody of the child.  The trial court granted the petition, finding that the five statutory grounds were proven by clear and convincing evidence and that terminating the mother's parental rights is in the best interests of the child.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Curtis W. Isabell, Clinton, Tennessee, for the appellant, Alisa S.

Herbert H. Slatery III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

FACTS AND PROCEDURAL BACKGROUND

Alisa S. ("Mother") and Christopher S. ("Father") (together, "Parents") are the biological parents of Masson S., born in April 2016.[1]  The Department of Children's

---

[1] In actions involving minors, it is this Court's policy to protect the privacy of the children by using only the first name and last initial, or only the initials, of the parties and witnesses, as appropriate.

Services ("DCS") has interacted with the family for several years; DCS became involved with Masson almost from birth. Two days after his birth, DCS's Child Protective Services division received a referral alleging that Masson was born drug-exposed. However, because Masson tested positive only for substances that had been prescribed to Mother, the case was closed. DCS received additional referrals concerning this family in June and July 2016, alleging environmental neglect and exposure to drugs. In July 2018, additional referrals were received for assistance with housing and food and for alleged drug exposure.

In March 2019, DCS received a referral after law enforcement officers pulled over Parents while traveling with several of their children, including Masson, and found suboxone and marijuana in their vehicle. During a follow-up visit by DCS on April 1, 2019, Mother admitted to smoking THC the previous day. Drug screens from that day came back positive for amphetamines, methamphetamine, and THC for both Parents. Pursuant to a petition filed by DCS, the Juvenile Court for Anderson County (the "Juvenile Court") entered an emergency protective order on April 16, 2019, placing Masson and his siblings into DCS custody due to the Parents' substance abuse. At court that day, the Parents tested positive again for amphetamines, methamphetamine, and THC. Masson has been in foster care continuously since that day.

The initial family permanency plan for the family was developed by DCS on May 10, 2019. The plan had a target completion period of six months, with a dual permanency goal of "return to parent/exit custody with relative." Following a permanency hearing, the Juvenile Court ratified the plan on June 11, 2019. The plan required Parents to (1) complete a mental health assessment and follow all recommendations, take medication as prescribed, and sign releases for DCS; (2) provide DCS with proof of completion of the assessment and any diagnoses; (3) submit to random drug screens and pill counts and bring prescriptions to screenings; (4) complete an alcohol and drug assessment, continue treatment until released by a provider, and sign releases for DCS; (5) have their name on a lease or mortgage; (6) obtain and maintain stable housing for at least three months, provide proof of housing to DCS, and provide proof of rent or mortgage and utilities to DCS; (7) comply with random home visits by DCS; (8) obtain and maintain and provide proof of legal income; (9) pay child support as ordered and until ordered pay $50 per month for Masson; (10) complete parenting classes, provide proof to DCS, and sign release for DCS; (11) utilize skills learned in classes to parenting the children; (12) generally behave appropriately at visits, be on time to visits, provide snacks and meals at visits, and not use or be under the influence of alcohol or drugs at visits; and (13) ensure access to transportation, have a valid driver's license, and have appropriate restraints for children in the vehicle. A second permanency plan, dated December 9, 2019, added the requirements that Mother complete intensive outpatient treatment ("IOP"), outpatient therapy, a full psychological evaluation, case management, and a hair follicle drug screen, as recommended by her mental health and A&D assessments. The Juvenile Court ratified the

plan at a hearing on January 14, 2020.[2]

On October 24, 2019, the Juvenile Court held an adjudicatory hearing, during which Parents waived their right to be heard and stipulated that Masson was under their "improper guardianship" due to their "substance use" pursuant to Tennessee Code Annotated section 37-1-102(b)(13)(F).[3] The Juvenile Court found that DCS had made reasonable efforts to prevent Masson's removal, adjudicated him dependent and neglected, and ordered that he remain in foster care. The order allowed Parents to have supervised visitation with Masson.

On February 11, 2020, DCS filed a petition to terminate Parents' parental rights to Masson and three of his siblings in the Juvenile Court,[4] alleging as grounds for termination (1) abandonment by failure to provide a suitable home; (2) abandonment by an incarcerated parent; (3) substantial noncompliance with permanency plans; (4) persistence of conditions; and (5) failure to manifest an ability and willingness to assume custody of Masson. The petition also alleged that terminating Parents' parental rights was in Masson's best interest. The petition noted that both Parents were incarcerated at some point during the four months preceding the filing of the petition.

Masson's maternal grandparents, William and Shirley P. ("Grandparents"), filed a "Motion to Intervene and for Temporary Legal Custody and Physical Custody" as to Masson and another sibling in the Juvenile Court on October 22, 2020. The motion asserted that they were Masson's maternal grandparents; that they were financially and physically able to care for him; and that it would be in his best interest to be placed with them. The record does not contain an order addressing this motion. Grandparents also filed a notice in the Juvenile Court, stating that they had filed a petition for termination of parental rights and adoption in the Anderson County Circuit Court. [5]

On July 22, 2021, the Juvenile Court held a hearing on DCS's petition to terminate Mother's parental rights to Masson and his siblings.[6] At the outset, DCS non-suited the

---

[2] Additional permanency plans were developed by DCS and ratified by the Juvenile Court after DCS filed its petition to terminate Mother's parental rights on February 11, 2020. These plans included substantially the same requirements as those in the previous two plans.

[3] Under this statute, a child who "is under such improper guardianship or control as to injure or endanger the morals or health of such child or others" is dependent and neglected. Tenn. Code Ann. § 37-1-102(b)(13)(F).

[4] On October 1, 2020, DCS filed in the Juvenile Court a petition for termination of parental rights to another of Masson's siblings, Legion S. An appeal concerning that case was consolidated with the present appeal for purposes of oral argument. A separate opinion in that appeal is being filed concurrently with this opinion.

[5] Although that petition does not appear in the record before us, we take judicial notice of a February 9, 2021 order nonsuiting that petition, a copy of which DCS appended to its brief. *See Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 862 n.5 (Tenn. 2016); *see also* Tenn. R. Evid. 201.

[6] This was a consolidated hearing during which the Juvenile Court also heard a petition from DCS to adjudicate Legion S. as dependent and neglected and the petition to terminate her Parents' parental rights.

petition as to two of Masson's siblings and asked the court to hold the petition in abeyance as to the remaining sibling. The court then heard testimony from Melinda Edmonds, a DCS foster care team leader; Michelle Weitzel, a DCS foster care manager; Mother; and William P., the maternal grandfather. The court admitted into evidence, as a collective exhibit from DCS, a notebook of the filings in the dependency and neglect proceedings. The notebook included criminal citations, arrest warrants, and judgments against Mother.

The Juvenile Court entered a final written order terminating Mother's parental rights to Masson on September 18, 2021, concluding DCS proved by clear and convincing evidence the five statutory grounds for termination it had alleged and that terminating Mothers' parental rights was in Masson's best interest. Mother timely appealed.[7]

## ISSUE PRESENTED

The sole issue raised by Mother in this appeal is whether the trial court erred in terminating her parental rights by not placing Masson with Grandparents.

## STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the

---

[7] Father is not a party to this appeal. We will only make reference to him as necessary hereinafter.

child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

We give considerable deference to a trial court's findings about witness credibility and the weight of oral testimony, as the trial court had the opportunity to see and hear the witnesses. *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006). When an issue "hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Id.* (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)); *see also Franklin*

*Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) ("If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary.").

**ANALYSIS**

In order to terminate parental rights, a trial court must find by clear and convincing evidence that: (1) statutory grounds for termination of parental and guardianship rights have been established, and (2) termination is in the best interests of the child. *See* Tenn. Code Ann. § 36-1-113(c). Although Mother has not challenged the Juvenile Court's conclusion that DCS established five statutory grounds for terminating her parental rights and that terminating those rights is in the best interest of Masson, this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525–26. Accordingly, we begin our analysis by reviewing whether the proof presented at trial constitutes clear and convincing evidence of each ground for termination listed in the Juvenile Court's Final Order.

**I. Grounds for Termination**

**A. Abandonment by Failure to Provide a Suitable Home**

Tennessee Code Annotated section 36-1-113(g) provides that abandonment, as defined in section 36-1-102, is a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(1).[8] Section 36-1-102 provides, in relevant part, that abandonment occurs when:

> (a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (b) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the

---

[8] Unless otherwise indicated, this opinion cites to the version of a statute in effect at the time the petition for termination was filed on February 11, 2020.

department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

*Id.* § 36-1-102(1)(A)(ii).

We "consider[ ] whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). To terminate parental rights under this ground, the trial court must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home also requires that "[a]ppropriate care and attention be given to the child," *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home "be free of drugs and domestic violence," *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, 2016 WL 1621076, at *7. The Department should utilize its superior resources in assisting a parent to establish a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, 2014 WL 2587397, at *9 (citing *Tenn. Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)). For their part, "[p]arents must also make reasonable efforts towards achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child." *In re Hannah H.*, 2014 WL 2587397, at *9. Although section 36-1-102(1)(A)(ii)(c) requires DCS to make reasonable efforts towards the establishment of a suitable home for "a period of four (4) months following the physical removal" of the child, "the statute does not limit the court's inquiry to a period of four months immediately following the removal." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL

7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016).

The Juvenile Court found that DCS proved by clear and convincing evidence that Mother failed to provide a suitable home to which Masson could return at an early date. The court explained:

> Masson entered foster care on April 16, 2019 and has remained in foster care continuously since that time. Masson entered DCS custody due to allegations of substance abuse by the parents. At the time of removal, Masson was in the legal and physical custody of his parents and was removed from their home. On October 24, 2019[,] the parents stipulated that Masson was under improper guardianship in the care of the parents due to their substance abuse.
>
> . . . .
>
> In the four months following removal of the child into foster care, DCS made reasonable efforts to assist Respondents to establish a suitable home for the child by developing a permanency plan and referring or otherwise providing opportunities for the following: mental health assessments, alcohol and drug assessments, drug screens, supervised visitation opportunities, parenting classes, substance abuse services, mental health services, ongoing case management, child support services, and appropriate care and supervision for the child. In that same period of time, [Mother] ha[s] failed to complete any of the required services, did not maintain contact with DCS, did not maintain contact with the child, and did not demonstrate that [she] had in any meaningful way addressed [her] substance abuse problem. [Mother's] failure to make any effort, even minimal efforts to improve their home and personal condition demonstrated a lack of concern for the child such that it appears unlikely that they will be able to provide a suitable home for the child at an early date.
>
> . . . .
>
> [Mother] ha[s] not meaningfully addressed [her] substance abuse problems. [Mother] ha[s] continued to use illegal substances. [Mother] gave birth to a sibling to this child, L.S., on June 19, 2020. At the time of that child's birth, [Mother] was positive for buprenorphine, methamphetamine, and THC; the child, L.S., was positive for buprenorphine and methamphetamine. [Parents] were both present at the hospital and living together and in a relationship when L.S. was born and receiving treatment. [They] interacted with UT Security Police who discovered needles, alcohol, and white substance in a small baggie in [their] vehicle. [Mother] testified that she was aware of the substances that [were] found in the car and admitted that she knew they were

there. [Mother] was positive on a urine drug screen on April 21, 2021 for multiple substances including methamphetamine, and was positive on a hair follicle test the same month for multiple substances including methamphetamine. DCS Case Manager Michelle Weitzel testified about her efforts to verify Respondents' housing due to housing instability, her observation of [Mother] having track marks on her arms from intravenous drug usage, and her efforts to maintain contact with [Parents] when [they] were not in communication with DCS.

The record amply supports the Juvenile Court's findings. The court ordered Masson into DCS custody on April 16, 2019, due to his Parents' substance abuse. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a). Six months later, at an adjudicatory hearing in October 2019, Parents waived their right to be heard and stipulated as a true fact that Masson was under their "improper guardianship" due to their "substance use." The Juvenile Court found that DCS had made reasonable efforts to prevent Masson's removal, adjudicated him dependent and neglected, and ordered that he remain in foster care. *See id.* § 36-1-102(1)(A)(ii)(b). At the hearing on DCS's petition for termination, Melinda Edmonds, the foster care team leader assigned to Masson's case, testified that DCS had assisted Mother in April 2016 by connecting her with the Silver Linings program and then again making a referral to Helen Ross McNabb in July 2016, and that these services were also offered to the family in March 2019. After Masson entered the agency's custody, DCS developed an initial permanency plan on May 10, 2019, with the goal of placing Masson back with Parents. Ms. Edmonds also stated that Parents were living separately during the first four months of foster care and that DCS was unable to go into their homes or verify with neighbors if Parents lived at the addresses they provided. Ms. Edmonds expressed current concerns about Mother being able to provide a safe and stable home for Masson due to her repeated positive drug tests, failure to follow recommendations of mental health and drug and alcohol assessments, and recent criminal charges.

Neither Mother nor her witnesses provided countervailing evidence to Ms. Edmonds' testimony. There is no evidence in this record that Mother made any efforts to establish a suitable home to which Masson could return, notwithstanding DCS's efforts to assist. To the contrary, the record shows that Mother has "demonstrated a lack of concern for the child" by continuous drug use and engagement in criminal activity after Masson's removal from her custody. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *see also In re Hannah H.*, 2014 WL 2587397, at \*9 (explaining that a suitable home "requires that the home be free of drugs"). We affirm the trial court's conclusion that DCS proved this ground by clear and convincing evidence.

### B.  Abandonment by an Incarcerated Parent

Abandonment also occurs when:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). This statute "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. The term "failed to visit" means "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." *Id.* § 36-1-102(1)(E). The term "token visitation" means that any "visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(E).

With respect to this ground, the Juvenile Court found that there is clear and convincing evidence that Mother abandoned Masson by failing to visit him and by demonstrating a wanton disregard for him. In its order, the court first stated that Mother was incarcerated for driving-related offenses at one point during the four months preceding the filing of the termination petition on February 11, 2020. The court then found that Mother had shown a wanton disregard for Masson "by failing to provide appropriate care and supervision for the child, [her] substance abuse, [and] failure to visit the child regularly[.]" The court noted that although Mother completed mental health and alcohol and drug assessments, she did not complete the recommendations from those assessments, required under the applicable permanency plan. Further, the court found that there were no barriers preventing Mother from visiting Masson during the four months preceding her brief incarceration.

The record supports the Juvenile Court's findings. During her testimony, Ms. Edmonds confirmed that Mother was incarcerated on January 11, 2020 on "some driving related, child restraint related charges," which date falls squarely within the four-month relevant period. Ms. Edmonds also testified that during the months preceding Mother's incarceration, she visited Masson only once, on November 14, 2019.[9] Mother arrived late that day, and drug screening conducted at that time came back "positive for amphetamines, suboxone, meth[,] and THC." Ms. Edmonds stated that she had no knowledge of any barriers to visitation and that Mother has continued to use illegal drugs. We agree with the

---

[9] Prior to this November 2019 visit, Mother's last visit to Masson was on May 29, 2019.

Juvenile Court that DCS carried its burden of establishing by clear and convincing evidence that Mother abandoned Masson by failing to visit him during the four months preceding her incarceration and by exhibiting a wanton disregard for his welfare. This ground for termination is affirmed.

### C. Substantial Noncompliance with Permanency Plans

Parental rights may be terminated for "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground is not established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). If the trial court does not make a finding with respect to the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue *de novo*. *See In re Valentine*, 79 S.W.3d at 547.

Here, the Juvenile Court found, and the record establishes, that DCS explained to Mother her requirements and responsibilities under the two permanency plans that Mother signed prior to the filing of DCS's petition for termination. The court ratified these plans, finding that the requirements therein were "reasonably related to remedying the reasons for foster care." We agree with the Juvenile Court; upon review, we too find that the requirements reasonably sought to address Mother's substance abuse, unstable housing, and parenting issues. The Juvenile Court also found that DCS made reasonable efforts to assist Mother by making referrals and by providing other opportunities to address these issues but that Mother did not avail herself of this assistance. Specifically, the court noted that Mother completed mental health and alcohol and drug assessments but then failed to follow any of the recommendations; that she did not visit Masson regularly or maintain consistent contact with him or DCS; and that she did not take steps to address her substance abuse problems.

The record supports these findings. Both Ms. Edmonds and Ms. Weitzel described DCS's efforts to engage Mother, including referrals, attempts to conduct home visits, and telephone calls. Ms. Edmonds testified that Mother visited Masson only once during the four months preceding her January 11, 2020 incarceration and that there were no barriers to visitation. Ms. Edmonds also said that despite multiple attempts, DCS was unable to verify Mother's housing and to determine whether the conditions would be safe. In addition, over a year after Masson's removal from Mother's custody, Mother gave birth to a drug-exposed sibling to Masson on June 19, 2020. The baby tested positive for multiple drugs at birth. Ms. Weitzel testified that Mother tested positive for methamphetamine, diazepam, THC, and benzodiazepines on April 23, 2021.

The foregoing circumstances indicate Mother's substantial noncompliance with the requirements set forth in the permanency plans, and they are not "[t]rivial, minor, or technical deviations from [the] permanency plan's requirements[;]" rather, the record indicates that Mother essentially completed no part of the permanency plan. *In re M.J.B.*, 140 S.W.3d at 656. We agree with the Juvenile Court's conclusion that DCS proved this ground for termination by clear and convincing evidence, and we affirm.

### D.    Failure to Remedy Persistent Conditions

Next, the trial court also terminated Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3), which provides that termination may occur when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).

As we have previously explained:

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at \*6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [ ] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, [2008 WL 4613576, at \*20] (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016). Additionally,

this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

*In re Daylan D.*, 2021 WL 5183087, at \*9.

As a threshold matter, the record before us indicates that the Juvenile Court first entered an order removing Masson from his Parents' custody on April 16, 2019, due to Parents' ongoing substance abuse issues. Masson has remained in foster care continuously since that day. Approximately six months later, on October 24, 2019, Parents stipulated that Masson was under their "improper guardianship" because of their "substance use," and the court adjudicated him as a dependent and neglected child. We now determine whether these conditions persist and prevent the safe return of Masson to the care of Mother, whether the conditions are likely to be remedied at an early date, and whether a continued relationship with Mother would prevent Masson's early integration into a stable, permanent home.

- 13 -

The Juvenile Court found by clear and convincing evidence that the conditions that led to Masson's removal from Mother's custody persist, given that Mother has failed to address her "sobriety and continues to use illegal drugs" and that "conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the child." The record supports the court's conclusions. Undisputed testimony from Ms. Edmonds and Ms. Weitzel establishes that Mother's substance abuse persists: in November 2019, she tested positive for amphetamines, suboxone, methamphetamine, and THC during a visit with Masson; in June 2020, she gave birth to a drug-exposed baby; and in April 2021, more than a year after the petition to terminate her parental rights to Masson had been filed, Mother again tested positive for methamphetamine, diazepam, THC, and benzodiazepines. Both DCS case workers expressed concerns about Mother's stability based on her continued positive tests for drugs and on her failure to follow recommendations from the mental health and drug and alcohol assessments. In addition to the substance abuse issue, Mother has failed to provide a suitable home and is in substantial noncompliance of the permanency plans originally designed for reunification with Masson.

Under these circumstances, we conclude that there is "little likelihood" the substance abuse that led to removal of Masson from Mother's care would be "remedied at an early date." Tenn. Code Ann. § 36-1-113(g)(3)(ii). Further, according to Ms. Weitzel, Masson "is very well adjusted" in his foster placement and "very bonded with [his foster parents], as well as the other child in the home and their extended family," and it would be "traumatic" for Masson to be removed from that environment. Thus, the continuation of Mother's involvement in Masson's life "greatly diminishes the child's chances of early integration into a safe, stable, and permanent home." *Id.* § 36-1-113(g)(3)(ii). We affirm the trial court's ruling on this ground for termination.

### E. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination when:

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute requires "a parent to

- 14 -

manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, *13 (Tenn. Ct. App. June 20, 2018)).

> As to the second prong of section 36-1-113(g)(14),
> [t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The Juvenile Court found clear and convincing evidence that Mother failed to manifest an ability and willingness to assume legal and physical custody of Masson, referencing her substantial noncompliance with the permanency plans; her failure to visit him regularly; her minimal efforts to provide a safe home and address her substance abuse despite DCS's assistance; and her incarceration nine months after Masson's removal, in January 2020. These findings are supported by the record, uncontroverted, and lead to the conclusion that Mother manifested neither an ability nor a willingness to assume custody of Masson. The first prong of section 36-1-113(g)(14) is satisfied.

The record also supports the trial court's finding that the second prong of section 36-1-113(g)(14) is satisfied. Masson was removed from Mother's care due to substance abuse, an issue that had not been resolved at the time of trial. Mother did not testify or offer any evidence to the contrary. Nor did she address her failure to secure a suitable home, to visit Masson, or to comply with the requirements of the permanency plans. Moreover, Ms. Weitzel testified that it would be traumatic to remove Masson from his foster placement where he is thriving. Placing Masson in her custody, therefore, "pose[s] a risk of substantial harm to [his] physical [and] psychological welfare." Tenn. Code Ann. § 36-1-113(g)(14). Accordingly, this ground for termination was proven by clear and convincing evidence. We affirm.

## II.    Best Interests of the Child

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination

- 15 -

is in the child's best interests. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

We consider nine statutory factors when analyzing best interests:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

This list is non-exhaustive.[10] *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

In determining that terminating Mother's parental rights is in Masson's best interest, the Juvenile Court made specific findings concerning each statutory factor listed in Tennessee Code Annotated section 36-1-113(i). The court found that Mother made no changes in her circumstances or conduct—despite having received assistance from DCS—because she has no stable home, continues to use drugs and to engage in criminal behavior, and has not maintained contact with Masson. *Id.* § 36-1-113(i)(1)-(2). The court also found that Mother did not visit Masson regularly or have a meaningful relationship with him, and that changing his current foster placement would "have a detrimental effect" because of his bonding with the foster parents. The record reflects that Mother's last in-person visit with Masson was in November 2019 and that, according to Ms. Weitzel, Masson does not ask about his Parents and refers to the foster parents as "mommy and daddy." Ms. Weitzel also stated her concern that removal from the foster home would be traumatic for Masson. *See id.* § 36-1-113(i)(3)-(5).

The Juvenile Court found that Parents abused Masson and his sibling, Legion, and that there remains crime and drug use in Mother's life, which renders her "consistently unable to care for the child in a safe and stable manner." *Id.* § 36-1-113(i)(6)-(7). The record is unequivocal on this. We also agree with the court that Mother's mental or emotional state would be detrimental to Masson, inasmuch as her mental or emotional state has kept her, for several years now, from "effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The court did not make findings concerning child support. *Id.* § 36-1-113(i)(9).

On this record, it is evident to this Court that the statutory factors, taken as a whole,

---

[10] The Tennessee General Assembly recently amended the statutory best interest factors provided in Tennessee Code Annotated section 36-1-113(i). *See* 2021 Tenn. Pub. Acts, ch. 190 § 1. This amendment does not affect the instant case because we apply the version of the statute in effect at the time the petition for termination was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

overwhelmingly demonstrate that terminating Mother's parental rights is in Masson's best interest. As the Juvenile Court stated, it boils down to this: Mother has "shown little or no interest in the welfare of the child" and, after Masson's removal from her custody, "continue[d] to make lifestyle choices which prevent [her] from being able to safely parent the child."

### III.     Placement with Grandparents

The last issue before us—and the only one raised by Mother on appeal—is whether the Juvenile Court committed reversible error by failing to place Masson with his maternal Grandparents. Mother argues that DCS was required to place Masson with Grandparents and that because such action did not take place, the Juvenile Court was precluded from terminating her parental rights. In support of this position, Mother references Tennessee Code Annotated sections 37-1-129 and -130 and DCS Administrative Policies and Procedures: 16.46. She also notes that the trial court did not address the motion to intervene and for temporary legal and physical custody filed by Grandparents on October 26, 2020. DCS responds that the court properly did not consider Grandparents' motion because the motion did not seek to intervene in the termination proceedings, ask for guardianship of Masson, or state that Grandparents were prospective parents. In other words, DCS asserts that termination proceedings do not determine custody or placement, which is what Grandparents requested in their motion. In addition, DCS asserts that in termination proceedings, a trial court is not required to consider whether DCS had placed a child with relatives.

Mother's argument is not novel to this Court. In *In re Aiden R. B.*, a mother whose parental rights were terminated argued on appeal that the trial court erred in terminating her parental rights because "DCS failed to make reasonable efforts to reunite the Children with their maternal family." No. E2011-00147-COA-R3PT, 2011 WL 2206637, at *11 (Tenn. Ct. App. June 7, 2011). We rejected that notion, clarifying that the matter under this Court's review "does not concern the placement of the Children but instead is a proceeding to terminate Mother's parental rights . . . [and] that Mother's extended family never undertook any legal action to attempt to gain custody of the Children, if ever, *until after* the petition to terminate Mother's parental rights had been filed after the completion of the dependency and neglect proceeding." *Id.* (emphasis added). We then explained that "DCS is not required under either statutory or case law to make reasonable efforts to reunite children with their extended family prior to terminating a parent's parental rights." *Id.*

The facts here are strikingly similar to those in *In re Aiden R. B.* The Juvenile Court adjudicated Masson as a dependent and neglected child and ordered him to remain in foster care in October 2019. Grandparents did not file their motion seeking "temporary physical and legal custody" of Masson until October 2020, a year after the dependency and neglect proceedings had concluded and more than eight months after DCS had filed its petition to terminate Parents' parental rights to Masson. At the time they filed their motion, no matters

of temporary placement or custody remained before the Juvenile Court. *See In re K.L.D.R.*, No. M2008-00897-COA-R3-PT, 2009 WL 1138130, at \*8 (Tenn. Ct. App. Apr. 27, 2009) ("[T]his issue concerns custody and should have been raised in the dependency and neglect proceeding. It is not a basis to defeat a petition to terminate parental rights."). Rather, the Juvenile Court's sole task was to determine whether DCS established by clear and convincing evidence (1) at least one statutory ground for termination and (2) that termination of Mother's parental rights is in the best interests of Masson. *See In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at \*18 (Tenn. Ct. App. July 6, 2021) (citing Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d at 552). "To rule otherwise would be to substitute our own policy judgment for that of our General Assembly, something we will not do." *In re Aiden R. B.*, 2011 WL 2206637, at \*11. Mother presented no applicable authority to the contrary, and we found none.[11] Mother's argument is without merit.

## CONCLUSION

The judgment of the Juvenile Court is affirmed in all respects and remanded for proceedings consistent with this opinion. Costs of this appeal are assessed to the appellant, Alisa S., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE

---

[11] The two statutes cited by Mother, from Title 37 of the Tennessee Code, are not applicable to termination of parental rights proceedings, which are governed by Title 36. *In re Jah'Lila S.*, No. W2021-01199-COA-R3-PT, 2022 WL 4362839, at \*3 (Tenn. Ct. App. Sept. 21, 2022) ("Tennessee Code Annotated section 36-1-113 governs the termination of parental rights in Tennessee."). Likewise, Administrative Policies and Procedures: 16.46 on "Child/Youth Referral and Placement" was promulgated under the authority of Title 37. *See* DCS Admin. Pol'ies & Procs: 16.46, https://www.tn.gov/dcs/program-areas/qi/policies-reports-manuals/policiesprocedures.html (last visited October 26, 2022).